IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NORMAN N. HANSEN,                              )
                                               )
              Plaintiff,                        )
                                               )
        v.                                     )        No. _____
                                               )
SHELL DEVELOPMENT CORPORATION-LAWAI,           )
a Hawaiian corporation, SHELL DEVELOPMENT      )
CORPORATION, an Illinois corporation,          )
SHELL HOLDINGS, INC., a Delaware corporation,  )
SHELL VACATIONS, LLC, and SG, INC.,            )
an Illinois corporation,                       )
                                               )
              Defendants.                       )

**03C 6050**

## COMPLAINT

Plaintiff Norman N. Hansen by Vincent A. Lavieri, Steven L. Wiser and Douglas C. Giese,

his attorneys, with Defrees & Fiske, of counsel, as and for his Complaint against Defendants Shell

Development Corporation-Lawai, a Hawaiian corporation, Shell Development Corporation, an

Illinois corporation, Shell Holdings, Inc., a Delaware corporation, Shell Vacations, LLC, a limited

liability company, and SG, Inc., an Illinois corporation, states as follows:

## GENERAL ALLEGATIONS

**A.    PARTIES, JURISDICTION AND VENUE ALLEGATIONS**

1.    Plaintiff is a citizen of the State of Nevada.

2.    Defendant Shell Development Corporation-Lawai (hereinafter "SDC-Lawai") is a

corporation incorporated under the laws of the State of Hawaii and is not in good standing. SDC-

Lawai maintains an office and place of business in Northbrook, Illinois. At all relevant times, SDC-

Lawai was a licensed real estate broker and a registered time share sales agent in the State of Hawaii

1

and was engaged in the marketing and sale of time share units in the Lawai Beach Resort located in Koloa, Kauai, Hawaii. Pursuant to 28 U.S.C. §1391(c), SDC-Lawai is a resident of Illinois.

3.      Defendant Shell Development Corporation (hereinafter "Shell Development") is a corporation incorporated under the laws of the State of Illinois. Shell Development maintains its registered office in Chicago, Illinois, and has its principal place of business in Northbrook, Illinois. Pursuant to 28 U.S.C. §1391(c), Shell Development is a resident of Illinois.

4.      Defendant Shell Holdings, Inc. (hereinafter "Shell Holdings"") is a corporation incorporated under the laws of the State of Delaware and authorized to conduct business in Illinois. Shell Holdings maintains a registered office in Chicago, Illinois, and has its principal place of business in Northbrook, Illinois. Pursuant to 28 U.S.C. §1391(c), Shell Holdings is a resident of Illinois.

5.      Defendant Shell Vacations, LLC (hereinafter "Shell Vacations") is a limited liability company. Shell Vacations has its principal place of business in Northbrook, Illinois. Pursuant to 28 U.S.C. §1391(c), Shell Vacations is a resident of Illinois.

6.      Defendant SG, Inc., formerly known as Shell Group, Inc. (hereinafter "SGI") is a corporation incorporated under the laws of the State of Illinois. SGI maintains its registered office in Chicago, Illinois, and has its principal place of business in Northbrook, Illinois. Pursuant to 28 U.S.C. §1391(c), SGI is a resident of Illinois.

7.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(2) because Plaintiff is a citizen of the State of Nevada, a foreign state, and Defendants are citizens of the State of Illinois and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because all defendants reside in this judicial district.

**B.     GENERAL FACTUAL ALLEGATIONS**

9.     On or about July 6, 1992, SDC-Lawai and Metropolitan Mortgage Hawaii, Inc., a Hawaiian corporation, (hereinafter "MMII") entered into a Marketing and Management Agreement wherein SDC-Lawai was engaged as MMH's agent to manage all aspects of the marketing, sale, management, operation and development of the Lawai Beach Resort, an existing 110 unit resort time share project located on Kauai, Hawaii (hereinafter "the Lawai Beach Resort-Phase I").

10.     Pursuant to the July 6, 1992 agreement between SDC-Lawai and MMH referenced above, MMH agreed to pay SDC-Lawai a participation bonus upon sellout of the Lawai Beach Resort-Phase I project.

11.     On or about September 1, 1993, Plaintiff, who was a licensed real estate salesperson in Hawaii, entered into a written agreement entitled "Independent Contractors Contract-Sales" with Lawai Beach Realty Co., Inc. (hereinafter "LBR"), a Washington corporation, and SDC-Lawai (hereinafter "the Employment Agreement-Phase I") wherein Plaintiff was employed by LBR and SDC-Lawai as the Director of Sales/Kauai for the Lawai Beach Resort-Phase I project. Plaintiff's duties included selling time share units and supervising all aspects of the sales administration and operations for the Lawai Beach Resort-Phase I project. Attached hereto as Exhibit "A" is a copy of the Employment Agreement-Phase I.

12.     At some time subsequent to entering into the Employment Agreement-Phase I, SDC-Lawai became a licensed real estate broker and a registered time share sales agent in the State of Hawaii and replaced LBR as the sole registered time share sales agent/acquisition agent for the

Lawai Beach Resort project.

13.    Plaintiff's compensation for the fiscal year commencing October 1, 1994 was set forth in a an Attachment to Independent Contractors Agreement (*i.e.*, the Employment Agreement-Phase I) dated October 21, 1994 that was executed by SD-Lawai. Attached hereto as Exhibit "B" is a copy of said Attachment to Independent Contractors Agreement dated October 21, 1994.

14.    SDC-Lawai agreed to share between forty (40%) percent and fifty (50%) percent of the participation bonus with SDC-Lawai's senior management which included Plaintiff.

15.    On October 21, 1994, SDC-Lawai agreed to pay Plaintiff a "sell-out" or participation bonus of twenty-five (25%) percent of SDC-Lawai's share of the "sell-out" or participation bonus (hereinafter "the Phase I Bonus") payable pursuant to SDC-Lawai's July 6, 1992 agreement with MMH referenced above. Attached hereto as Exhibit "C" is a copy of SDC-Lawai's October 21, 1994 letter.

16.    On or about November 15, 1994, SDC-Lawai and MMH entered into a separate Marketing and Management Agreement wherein SDC-Lawai was engaged as MMH's agent to manage all aspects of the marketing, sale, management, operation, construction and development of an additional 60 residential time share units and five commercial units (hereinafter "Lawai Beach Resort-Phase II") to be constructed on a parcel adjacent to the Lawai Beach Resort-Phase I property.

17.    On April 10, 1995, SGI sent to Plaintiff a memorandum that set forth a summary of Plaintiff's compensation with respect to Plaintiff's for the Lawai Beach Resort-Phase II project. As set forth in Item No. 4 of said memorandum, Plaintiff's compensation for the Lawai Beach Resort-Phase II project was to include a "sell-out" or participation in the form of a "back-end participation." Attached hereto as Exhibit "D" is a copy of SGI's April 10, 1995 memorandum.

4

18.    On June 27, 1995, Plaintiff and SDC-Lawai entered into a second written employment agreement (hereinafter "the Employment Agreement-Phase II") wherein SDC-Lawai employed Plaintiff as the Director of Sales/Kauai for the Lawai Beach Resort-Phase II project. Plaintiff's duties included selling time share units and supervising all aspects of the sales administration and operations for the Lawai Beach Resort-Phase II project. Attached hereto as Exhibit "E" is a copy of the Employment Agreement-Phase II.

19.    As of June 27, 1995, the Lawai Beach Resort-Phase I project was substantially sold out.

20.    The Lawai Beach Resort-Phase II project is substantially sold out.

## C.    Alter Ego Allegations

21.    At all relevant times, Defendant SDC-Lawai was engaged in a single venture; to-wit: the sale and marketing of time share units in the Lawai Beach Resort located in Koloa, Kauai, Hawaii and was a mere shell, instrumentality of conduit for one or more of Defendants Shell Development Corporation, Shell Holdings, Shell Vacations, LLC, and/or SGI.

22.    Defendants are owned, operated and controlled by the same control group.

23.    Defendants operate out of the same corporate headquarters in Northbrook, Illinois.

24.    Defendants share and use the same employees at their corporate headquarters in Northbrook, Illinois.

25.    Defendants are alter egos of one another and, in order to avoid injustice and inequity, the corporate formalities should be disregarded so as not to defeat Plaintiff's rightful claim.

**COUNT I**
**BREACH OF CONTRACT**
**(EMPLOYMENT AGREEMENT-PHASE I)**

1-25.    Plaintiff realleges paragraphs 1-25, inclusive, of the Parties, Jurisdiction and Venue Allegations, the General Factual Allegations and the Alter Ego Allegations as paragraphs 1-25, inclusive, of this Count I.

26.    On August 30, 2002, Shell Vacations, an affiliate of SDC-Lawai, wrote to Francis G. "Rusty" Hutchinson (hereinafter "Hutchinson"), the Project Direct of the Lawai Beach Resort project. Attached hereto as Exhibit "F" is a copy of said August 30, 2002 letter.

27.    Based upon the attachment to the August 30, 2002 letter, it appears that SDC-Lawai or an affiliated entity received a "sell-out" or participation bonus of $1,750,000 with respect to the Lawai Beach Resort-Phase I project. The share of SDC-Lawai's "sell-out" or participation bonus that was to be distributed to SDC-Lawai's senior management was between forty (40%) percent and fifty (50%) percent or between $700,000.00 and $837,500.00.

28.    As set forth in the October 21, 1994 letter , a copy of which is attached hereto as Exhibit "C," the Phase I Bonus that Plaintiff should have received was twenty-five (25%) percent of SDC-Lawai's senior management's share of the "sell-out" or participation bonus or between $175,000.00 and $218,750.00.

29.    Defendants breached their contract with Plaintiff by failing and refusing to pay Plaintiff the Phase I Bonus.

30.    Plaintiff has demanded payment of his Phase I Bonus and Defendants have, without lawful justification, failed and refused to pay Plaintiff the same.

31.    Plaintiff has performed all required of him pursuant to the Employment Agreement-Phase I.

**WHEREFORE,** Plaintiff Norman N. Hansen requests the court as follows:

6

A.    To order an accounting with respect to the Lawai Beach Resort-Phase I project;

B.    To enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount of twenty-five (25%) percent of 50% of the "sell-out" or participation bonus that Shell Development Corporation-Lawai and/or any other Defendants received;

C.    To award Plaintiff pre-judgment pursuant to Hawaii Revised Statutes §636-16 at the rate of ten (10%) percent per annum as provided in Hawaii Revised Statutes §478-2;

D.    To award Plaintiff his attorneys' fees and costs of suit; and

E.    To grant Plaintiff such further relief as the court deems appropriate.

## COUNT II
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (EMPLOYMENT AGREEMENT-PHASE I)

1-31.    Plaintiff realleges paragraphs 1-31, inclusive, of Count I as paragraphs 1-31, inclusive, of this Count II

32.    Subsumed in every contract in the State of Hawaii is a duty of good faith and fair dealing in performing contractual obligations.

33.    Defendants breached the duty of good faith and fair dealing with respect to the Employment Agreement-Phase I by, among other things,

A.    improperly refusing to pay Plaintiff his Phase I Bonus based upon litigation between Defendants or one of their affiliated entities and Tait, Ltd., and Hutchinson, which litigation was unrelated to Plaintiff;

B.    improperly claiming that Hutchinson, a non-party to the Employment Agreement-Phase I, was responsible for payment of the Phase I Bonus to Plaintiff;

7

C.   improperly deducting expenses in calculating the Phase I Bonus due Plaintiff; and

D.   failing to act and to exercise contractual discretion in good faith in connection with the determination of and payment of the Phase I Bonus to Plaintiff.

**WHEREFORE,** Plaintiff Norman N. Hansen requests the court as follows:

A.   To order an accounting with respect to the Lawai Beach Resort-Phase I project;

B.   To enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount of twenty-five (25%) percent of 50% of the "sell-out" or participation bonus that Shell Development Corporation-Lawai and/or any other Defendants received;

C.   To award Plaintiff pre-judgment pursuant to Hawaii Revised Statutes §636-16 at the rate of ten (10%) percent per annum as provided in Hawaii Revised Statutes §478-2;

D.   To award Plaintiff his attorneys' fees and costs of suit; and

E.   To grant Plaintiff such further relief as the court deems appropriate.

## COUNT III
### BREACH OF CONTRACT
### (EMPLOYMENT AGREEMENT-PHASE II)

1-25.   Plaintiff realleges paragraphs 1-25, inclusive, of the Parties, Jurisdiction and Venue Allegations, the General Factual Allegations and the Alter Ego Allegations as paragraphs 1-25, inclusive, of this Count III.

26.   Pursuant to Section II. B. of the Employment Agreement-Phase II, SDC-Lawai agreed to pay SDC-Lawai's senior management, which included Plaintiff, forty (40%) percent to forty-five (45%) percent of the participation or "Back-End Fee" that was paid to SDC-Lawai with respect to the Lawai Beach Resort-Phase II project .

27.    MMH and SDC-Lawai renegotiated the November 15, 1994 Marketing and Management Agreement.

28.    The renegotiated November 15, 1994 Marketing and Management Agreement modified the nature of the compensation that SDC-Lawai was to receive with respect to the Lawai Beach Resort-Phase II project and deleted the Back-End Fee.

29.    As a result of the renegotiated November 15, 1994 Marketing and Management Agreement, SDC-Lawai claims to no longer have an obligation to pay to Plaintiff his share of senior management's forty (40%) percent to forty-five (45%) percent share of SDC-Lawai's Back End Fee.

30.    On information and belief, the total compensation that SDC-Lawai received with respect to the Lawai Beach Resort-Phase II project did not materially change.

31.    On information and belief, Plaintiff would have received in excess of $100,000 as his share of the Back-End Fee pursuant to the Employment Agreement-Phase II. but for the renegotiation of the November 15, 1994 Marketing and Management Agreement.

32.    Defendants breached the Employment Agreement-Phase II by failing and refusing to pay Plaintiff his share of the Back-End Fee with respect to the Lawai Beach Resort-Phase II.

33.    Plaintiff has demanded payment of his share of the Back-End Fee with respect to the Lawai Beach Resort-Phase II and Defendants have, without lawful justification, failed and refused to pay Plaintiff the same.

34.    Plaintiff has performed all required of him pursuant to the Employment Agreement-Phase II.

**WHEREFORE,** Plaintiff Norman N. Hansen requests the court as follows:

A.    To order an accounting with respect to the Lawai Beach Resort-Phase II project;

9

B.     To enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount of twenty-five (25%) percent of the forty (40%) percent to forty-five (45%) percent of the Back-End Fee that Shell Development Corporation-Lawai and/or any other Defendants received or, in the alternative, to award Plaintiff such sums as Plaintiff would have otherwise received had Shell Development Corporation-Lawai not renegotiated the November 15, 1994 Marketing and Management Agreement with MMH;

C.     To award Plaintiff pre-judgment pursuant to Hawaii Revised Statutes §636-16 at the rate of ten (10%) percent per annum as provided in Hawaii Revised Statutes §478-2;

D.     To award Plaintiff his attorneys' fees and costs of suit pursuant to Article XI of the Employment Agreement-Phase II; and

E.     To grant Plaintiff such further relief as the court deems appropriate.

## COUNT IV
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (EMPLOYMENT AGREEMENT-PHASE II)

1-34.    Plaintiff realleges paragraphs 1-34, inclusive, of Count III as paragraphs 1-34, inclusive, of this Count IV.

35.    Subsumed in every contract in the State of Hawaii is a duty of good faith and fair dealing in performing contractual obligations.

36.    Defendants breached the duty of good faith and fair dealing with respect to the Employment Agreement-Phase II by engaging in a course of conduct involving the renegotiation of November 15, 1994 Marketing and Management Agreement so that Plaintiff was deprived of his right to participate in the Back-End Fee.

10

**WHEREFORE,** Plaintiff Norman N. Hansen requests the court as follows:

A.　　To order an accounting with respect to the Lawai Beach Resort-Phase II project;

B.　　To enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount of twenty-five (25%) percent of the forty (40%) percent to forty-five (45%) percent of the Back-End Fee that Shell Development Corporation-Lawai and/or any other Defendants received or, in the alternative, to award Plaintiff such sums as Plaintiff would have otherwise received had Shell Development Corporation-Lawai not renegotiated the November 15, 1994 Marketing and Management Agreement with MMH;

C.　　To award Plaintiff pre-judgment pursuant to Hawaii Revised Statutes §636-16 at the rate of ten (10%) percent per annum as provided in Hawaii Revised Statutes §478-2;

D.　　To award Plaintiff his attorneys' fees and costs of suit pursuant to Article XI of the Employment Agreement-Phase II; and

E.　　To grant Plaintiff such further relief as the court deems appropriate.

**NORMAN N. HANSEN**

By: _____

One of His Attorneys

Vincent A. Lavieri
Steven L. Wiser
Douglas C. Giese
Defrees & Fiske
200 South Michigan Avenue; Suite 1100
Chicago, IL 60604-2480
312-372-4000

11

## INDEPENDENT CONTRACTORS CONTRACT - SALES

This Independent Contractors Contract - Sales (this "Agreement") is made and entered into this
____1st____ day of ____September____, 19̲9̲3 by and between

A.    Lawai Beach Realty Co., Inc. ("LBR"), a ~~Hawaii~~ corporation which is a licensed real
estate broker and a registered time share sales agent and time share acquisition agent for the Lawai
Beach Resort time share plan located at 5017 Lawai Road, Koloa, Hawaii (the "Lawai Project"), and
Shell Development Corporation-Lawai (hereinafter "SDC-L"), a Hawaii corporation, which is in the
processing of becoming a licensed real estate broker and a registered time share sales agent for the Lawai
Project (and upon obtaining such license and registration, SDC-L shall replace LBR as the sole
registered time share sales agent/acquisition agent for the Lawai Project), LBR and/or SDC-L being
sometimes referred to as "Principal" as provided below, and

B.    ____Norm Hansen_____, of ___5492 Koloa Rd.
Ste. 167, Koloa̲, Kauai, HI  96756-9498, ("Contractor"), who is a licensed real estate
salesperson and time share sales agent, and who desires to perform certain services for the Principal,
and/or each "Designated Affiliate" (as hereinafter defined), as more particularly hereinafter set forth.

In consideration of the mutual covenants and promises of the parties set forth below, the
Principal and Contractor agree as follows:

1.    Retainment. The Principal hereby engages and retains Contractor to sell to Purchasers, on the
terms and conditions hereinafter set forth, "Units in Projects" (as those terms are hereinafter defined); provided
that until such time as SDC-L becomes a licensed real estate broker/registered time share sales agent for the Lawai
Project, Contractor shall hold his/her real estate/time share licenses under LBR; but at the direction of SDC-L
upon its becoming a licensed real estate broker/registered time share sales agent for the Lawai Project, Contractor
shall hold his/her real estate/time share licenses under SDC-L.  Contractor agrees to promptly execute all
documents and do all other things necessary or convenient, as directed by SDC-L, in order that his/her real
estate/time share licenses shall be held under LBR or SDC-L, as provided for in this paragraph.

2.    Definitions. The following definitions apply to the terms used throughout this Agreement and
any addenda hereto:

EXHIBIT

A

(a)   "Project(s)" - Development(s) consisting of one or more of the following: condominium(s), apartment(s), resort(s), hotel(s), motel(s) or club(s), all or a part of which is committed to a Time-Sharing Plan, including, without limitation, the Lawai Project.

(b)   "Affiliate" - any entity involved in any aspect of the resort time-sharing industry in the State of Hawaii and which either (i) is controlled by, or controls, or is under common control with, SDC-L or with The Kona Coast Resort Limited Partnership, a Hawaii limited partnership, Shell Development Corporation-Kona, a Hawaii corporation, The Kona Coast Resort Joint Venture, which is registered as a Hawaii general partnership, Shell Realty Maui, Inc., a Hawaii corporation, or Shell Management Hawaii, Inc., a Hawaii corporation (said entities hereinafter being individually and collectively referred to as the "Shell-Related Entities"), or (ii) twenty five percent (25%) or more of whose equity ownership is held by the same entity, entities and/or individual(s) who hold a majority of the equity ownership of the SDC-L or of any Shell-Related Entities. [Note: Each of the Shell-Related Entities has been and is now involved in acquiring, developing, marketing, selling, and/or managing of one or more Projects in the State of Hawaii, is affiliated with SDC-L, and has, in the course of conducting its businesses in Hawaii, developed many of the proprietary documents and information which is referred to in paragraph 5 herein, and which SDC-L will use or otherwise benefit from in the marketing and selling of the Lawai Project.]

(c)   "Accommodation" - Any apartment, condominium or cooperative unit, cabin, lodge, hotel or motel room or any other private or commercial structure which is situated on real property and designed for occupancy by one or more individuals.

(d)   "Facilities" - Any structure, service, improvement, or real property (improved or unimproved), which is made available to the Purchasers of a Time Sharing Plan.

(e)   "Time-Share Unit" - An Accommodation or Facility of a Time-Sharing Plan which is divided into Time-Share Periods.

(f)   "Time-Share Period" - That period of time when a Purchaser of a Time-Sharing Plan is entitled to the possession and use of the Accommodations or Facilities, or both, of a Time-Sharing Plan.

(g)   "Time-Sharing Plan" - Any arrangement, plan, scheme, or similar device, but not including exchange programs, whether by membership, agreement, tenancy in common, sale, lease, deed, rental agreement, license, right to use agreement, or by any other means, whereby a Purchaser, in exchange for consideration, receives a right to use Accommodations or Facilities, or

2

both, for a specific period of time less than a full year during any given year, but not necessarily for consecutive years, and which extends for a period of more than three (3) years.

(h)    "Purchasers" - Purchasers, lessors, licensees or any other party acquiring a possessory interest or right of use in, or title to, a Unit.

(i)    "Purchase" - Acquisition of a possessory interest or right of use in, or title to, a Unit.

(j)    "Units" - Time-Share Unit.

(k)    "Principal" shall include LBR and SDC-L, until such time as SDC-L obtains its real estate broker license and is registered as a time share sales agent for the Project, after which time the term "Principal" shall refer solely to SDC-L.

3.    Term. This Agreement shall commence on Sept. 1, 1993, and terminate two (2) years from the date of commencement. Either Principal or Contractor may terminate this Agreement on thirty (30) days written notice to the other party at the address specified above.

4.    Other Activities. Contractor shall devote all of his time, attention, knowledge and skills solely to the business and interests of the Principal and of such Affiliates as SDC-L shall direct or permit from time to time (herein the "Designated Affiliates"), and the Principal and said other parties shall be entitled to all of the benefits, profits or other issues arising from or incident to all work, services, and advice of Contractor. Contractor shall not during the term hereof be interested, directly or indirectly, in any manner, as partner, officer, director, stockholder, advisor, employee or in any other capacity in any other business similar to the business of the Principal, any Shell-Related Entities, or any Designated Affiliate; provided, however, that nothing herein contained shall be deemed to prevent or limit the right of Contractor to invest any of his/her surplus funds in the capital stock or other securities of any corporation whose stock or securities are registered with the Securities and Exchange Commission and are regularly traded on any public exchange.

5.    Trade Secrets. Contractor shall not during the term of this Agreement or after its termination, at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation, any information concerning any matters affecting or relating to the business of the Principal, any Shell-Related Entities or any Designated Affiliate, including without limiting the generality of the foregoing, any names of, or information concerning, employees or agents of the Principal, the Shell-Related Entities; or Purchasers or prospective Purchasers of any Unit; the prices at which the Principal, any Shell-Related Entities or any Designated Affiliate sells, intends to sell or has sold any Units or any other information concerning the business of the Principal, any Shell-Related Entities or any Designated Affiliate, the manner in which each of said

2

parties conduct their respective operations, their respective plans, procedures, marketing programs, documents, agreements, and all other data; Contractor hereby acknowledging and agreeing that (1) the resort time-sharing industry in which the Principal, any Shell-Related Entities and the Designated Affiliates compete is a highly specialized market; (2) the identity and particularized requirements of the customers of, and Purchasers and prospective Purchasers from, the Principal, any Shell-Related Entities and the Designated Affiliates and the manner in which they are identified and generated are not generally known in the resort time-sharing industry; and (3) the Principal, any Shell-Related Entities and the Designated Affiliate(s) each have a proprietary interest in (a) all documents and information concerning their respective employees, agents, customers, prospective Purchasers, and Purchasers; (b) the prices at which any of them sells, intends to sell or has sold any Units or other services or goods which are related to or in connection with the operation of a resort time-share project; (c) the manner in which each of the Principal, any Shell-Related Entities and each Designated Affiliate conducts its operation; and (d) the plans, procedures, marketing programs, documents, agreements, form documents and agreements, and all other data of each of the Principal, any Shell-Related Entities and each Designated Affiliate, all of which proprietary documents and information are highly confidential and constitute trade secrets. The parties hereby acknowledge and agree that any breach of the terms of this Paragraph 5 shall be a material breach of this Agreement.

6.      Covenant Not To Compete. If Contractor terminates this Agreement, Contractor shall not, for one (1) year immediately following the termination of this Agreement, engage, directly or indirectly in the selling of, or the procuring of Purchasers for, Units located in the "Restricted Area" (as hereinafter defined), nor shall Contractor be interested, directly or indirectly, in any manner, as partner, officer, director, stockholder, advisor, employee or in any other capacity in any business operating directly or indirectly in the Restricted Area and competitive with, or similar to, any of the businesses operated or conducted by the Principal, any Shell-Related Entities or any of the Designated Affiliate; provided, however, that nothing herein contained shall be deemed to prevent or limit the right of Contractor to invest any of his/her surplus funds in the capital stock or other securities of any corporation whose stock or securities are registered with the Securities and Exchange Commission and are regularly traded on any public exchange. As used in this Agreement, the term "Restricted Area" shall mean the Island of Kauai, Hawaii and if and only if Contractor should perform any services for one or more Designated Affiliates, then for each Designated Affiliate for whom Contractor performs services, the Restricted Area shall include that island on which said Project is located or Contractor performs its services, or both, as is applicable.

7.      Modification of Restrictive Covenants. In entering into this Agreement and establishing the foregoing covenants with respect to confidential information and competition contained in Paragraphs 5 and 6 above (hereinafter collectively the "Restrictive Covenants"), the parties have attempted and intend to limit Contractor's right to disclose information and compete only to the extent necessary to protect the Principal, any Shell-Related Entities and each Designated Affiliate from unfair competition. The parties recognize, however, that reasonable people may differ in making such a determination. Therefore, the parties hereby agree that if the

4

scope or enforceability of any of the Restrictive Covenants, as set forth herein, is found, by a court of competent jurisdiction, to be too broad or otherwise unenforceable, such court, in recognition of the intent of the parties as aforesaid, shall modify and enforce such Restrictive Covenant to the extent it believes to be reasonable under the circumstances existing at that time.

8.      Remedies.    Contractor agrees that the period of time and geographical limitations set forth in Paragraph 6 are reasonable and that the other provisions and covenants set forth in this Agreement, including, without limitation, the Restrictive Covenants, are necessary to protect the business and good will of the Principal, any Shell-Related Entities and each Designated Affiliate.  Contractor further agrees that a breach of any of the Restrictive Covenants will result in irreparable and continuing damage to the Principal, any Shell-Related Entities and each Designated Affiliate, for which money damages cannot provide adequate relief and, consequently, in the event of any breach of any of the Restrictive Covenants, the Principal, any Shell-Related Entities and each Designated Affiliate, or any of them, to the extent appropriate, shall, in addition to any other right or remedy available at law or in equity, be entitled both (1) to a preliminary or permanent injunction in order to prevent the continuation of such harm and (2) to liquidated damages in the amount of Five Hundred Dollars ($500) per day, for each day or part thereof that Contractor continues to so violate said Restrictive Covenant.  It is recognized and agreed that damages in such event are difficult to ascertain, though great and irreparable.  Nothing in this Paragraph 8 shall be construed to prohibit the Principal, any Shell-Related Entities and each Designated Affiliate from pursuing any one remedy to the exclusion of any other remedy, but, rather, all remedies shall be deemed cumulative and non-exclusive.

9.      Covenants and Restrictions.  Contractor agrees as follows:

(a)      Contractor shall (i) comply with, and abide by, all instructions (including but not limited to those set forth in Exhibit "A" attached hereto and made a part hereof) and regulations, whether written or verbal, from time to time issued by the Principal and each Designated Affiliate, including those governing scheduling and conditions of work and (ii) obey all lawful orders given by the Principal and each Designated Affiliate, or their respective duly authorized representatives and conduct himself/herself at all times during the performance of his/her duties hereunder in such a manner as to not bring discredit on himself/herself, the Principal and each Designated Affiliate or any Project.

(b)      Contractor agrees to observe all federal, state, and local laws, regulations and ordinances applicable to the performance of his/her duties hereunder.

(c)      Contractor agrees that he/she will make no representations or statements concerning any Project or any Units therein, to any Purchaser or prospective Purchaser, either verbally or in

5

writing, except as specifically approved by the Principal, or the applicable Designated Affiliate (said party hereinafter, for convenience only, sometimes referred to as the "Seller" [it is understood and accepted, however, that SDC-L shall act only as a licensed real estate broker /time share sale agent of the Lawai Project and is not the seller of time share interests in that Project and that the Seller now is Metropolitan Mortgage Hawaii, Inc. (the "Lawai Developer/Seller"]). Contractor further agrees not to present or show any Purchaser or prospective Purchaser any written material, except sales materials given to Contractor by the Seller.

(d)    Contractor agrees that during the term of this Agreement, and for one (1) year after termination of this Agreement, he/she will not sell or resell any interest in any Units in the Lawai Project, or the Project of each Designated Affiliate, purchased for his/her own account without the prior written consent of the applicable Seller. Each deed or other instrument of conveyance of any such interest in a Unit to Contractor shall contain a restrictive covenant to such effect.

(e)    Contractor agrees that in dealing with any Purchaser or prospective Purchaser he/she will never knowingly make any misstatement of fact or knowingly omit to state a fact necessary to make any affirmative representation not misleading.

(f)    Contractor shall not and has no authority to incur any expenses for or on behalf of the Principal, the Lawai Project Developer/Seller, or any Designated Affiliate.

(g)    During the term of this Agreement, Contractor agrees to maintain, at its sole cost and expense, and to provide to the Principal and each Designated Affiliate from time to time Certificates of Insurance evidencing the existence of, One Hundred Thousand Dollars ($100,000.00) liability insurance on any vehicles owned or leased by Contractor and used in Contractor's duties.

10.    Termination.  In addition to the termination provisions provided for in Paragraph 3 of this Agreement, the Principal and each Designated Affiliate, as the case may be, shall each have the right to terminate this Agreement effective on delivery of notice to Contractor without liability for expenses incident to termination, upon Contractor's violation of any of the provisions of this Agreement or for reasons of absence without notice, neglect of duties, disrespect, incompetence, intoxication, drug use, any act involving moral turpitude, failure to meet any established sales quotas, or for breaches of Contractor's duty of trust to the Principal or any Designated Affiliate.

The failure of the Principal, any Shell-Related Entities or any Designated Affiliate, as the case may be, at any time to exercise any right of termination arising under the provisions herein shall in no way affect the right of that party to exercise such right of termination thereafter.

In the event of termination of this Agreement for any reason, all sales manuals, materials, price lists, samples, lists and records concerning Purchasers or prospective Purchasers, copies of documents and mailing lists and any other items of personal property given to Contractor by the Principal, any Shell-Related Entities, or any Designated Affiliate shall be promptly returned to that party by Contractor.

11.     Contractor's Inability to Execute Agreements for the Principal, any Shell-Related Entities, the Lawai Project Developer/Seller, and each Designated Affiliate.  Notwithstanding anything herein to the contrary, Contractor shall not have the right to execute any agreements or make any commitments on behalf of the Principal, any Shell-Related Entities, the Lawai Project Developer/Seller, or any Designated Affiliate, including agreements or commitments conferring rights or obligations on Purchasers of Units from, or imposing any obligations on, the Principal, any Shell-Related Entities, the Lawai Project Developer/Seller, or any Designated Affiliate in the business of selling Units.

12.     Compensation.

(a)     Definitions - The following definitions shall apply to the terms used throughout this paragraph:

(i)     Net Sales Price - Net sales price shall be the consideration paid or to be paid for the Purchase of any Unit, agreed on by the Seller (or in the case of the Lawai Project, the Lawai Project Developer/Seller) and the Purchaser and set forth in the Agreement for Purchase of the Unit (a "Purchase Agreement"), less any financing charges, and any fees, discounts, travel allowances, rebates, and the value of any other form of financial inducement given to Purchaser (whether or not the Purchase Agreement reflects any of said financial inducements).

(ii)     CO Unit - A Unit shall be deemed to be a CO Unit if, as of the date of Seller's (or in the case of the Lawai Project, the Lawai Project Developer/Seller) acceptance of the Purchase Agreement for that Unit, a certificate of occupancy has been issued for the Accommodation or Facility in which it is located.

(iii)     Non CO Unit - A Unit shall be deemed to be a Non CO Unit if, as of the date of Seller (or in the case of the Lawai Project, the Lawai Project Developer/Seller)'s

7

acceptance of the Purchase Agreement for that Unit, no certificate of occupancy has been issued for the Accommodation or Facility in which it is located.

(iv)    Booked Sale - A sale pursuant to a Purchase Agreement shall be deemed a Booked Sale when: (a) the Purchase Agreement is accepted and executed by the Seller (or in the case of the Lawai Project, the Lawai Project Developer/Seller); (b) any and all cancellation/rescission periods have expired and the Purchase Agreement remains uncancelled; (c) all documentation required for the Closing (as defined in subparagraph 12(a)(v) below) of said sale has been deposited in escrow; and (d) the first to occur of (1) the Closing of the transaction described in the Purchase Agreement and (2) the expiration of twenty (20) days from the date of the Seller's (or in the case of the Lawai Project, the Lawai Project Developer/Seller) acceptance of said Purchase Agreement. The cancellation/rescission period shall be the period(s) during which the Purchaser, pursuant to the Purchase Agreement or the provisions of applicable laws or regulations, or both, has the unilateral right to rescind or cancel the Purchase Agreement.

(v)    Closing - The Closing on any Unit pursuant to a Purchase Agreement shall be deemed to have taken place on the date when: (a) all documents required to be delivered to the Seller (or in the case of the Lawai Project, the Lawai Project Developer/Seller), or deposited into escrow under the Purchase Agreement have been properly executed by the Purchaser(s) and so delivered to the Seller or deposited in escrow, as the case may be, with the intent to transfer possession and control of said documents; (b) all monies required to be paid under the Purchase Agreement, prior to delivery of the instrument(s) transferring an interest in said Unit, have been received by the appropriate parties; and (c) the Purchaser(s) is/are deemed to have acquired the interest in said Unit for which he/they bargained under the Purchase Agreement, as evidenced by the recordation of a transfer document in the Bureau of Conveyances of the State of Hawaii, located in Honolulu, Hawaii.

(vi)    Commission - The Commission is the compensation due Contractor for performance of his/her duties hereunder. Such Commission shall be based directly on Contractor's sale of CO Units and those Non CO Units as to which a Closing occurs and is in no way related to the number of hours Contractor has worked or any other non-sales or output related criteria. Commissions shall become payable to Contractor (although not paid until such time as provided for in sub-paragraph 12(c) below) (1) with respect to CO Units, when the sale thereof pursuant to a Purchase Agreement becomes a Booked Sale and (2) with respect to Non CO Units, when the Closing of the sale thereof

pursuant to a Purchase Agreement occurs. Commissions payable to Contractor shall be subject to chargebacks [as provided for in sub-paragraphs 12(d), 12(e) and 12(f) below], until such time as the Commission has been "Earned" [as defined in sub-paragraph 12(a)(viii) below].

(vii)     Advance - The Advance is a loan from the Principal on said Seller's behalf (or in the case of the Lawai Project, the Lawai Project Developer/Seller) to Contractor against the Commission which will become due Contractor upon the Closing of each sale by Contractor of a Non CO Unit. In other words, until the Closing of each Non CO Unit has occurred, no Commission shall be due to Contractor hereunder. Nevertheless, Advances (against Commissions) shall become payable to Contractor (although not paid until such time as provided for in sub-paragraph 12(c)(ii) below) when the sale of a Non CO Unit pursuant to a Purchase Agreement becomes a Booked Sale. Advances payable to Contractor shall be subject to chargebacks [as provided in sub-paragraphs 12(d), 12(e) and 12(f) below] until the Closing of the sale of a Non CO Unit with respect to which said Advance was made, at which time the Advance shall become a Commission (and, therefore, subject to all of the terms and provisions of this Agreement, including, for example, being subject to the chargebacks described below in this Paragraph 12).

(viii)    Earned Commission - Commissions on the sale of any Unit pursuant to a Purchase Agreement, to the extent said Commissions have not been reduced by chargebacks as provided in sub-paragraphs 12(d), 12(e) and 12(f) below, shall be deemed Earned on the first to occur of (A) payment in full by Purchaser of the purchase price set forth in the Purchase Agreement and (B) the last to occur of (1) the Seller's (or in the case of the Lawai Project, the Lawai Project Developer/Seller) receipt, in good funds, of six monthly payments of principal or principal and interest under the Purchase Agreement and (2) the Closing of the transaction contemplated by the Purchase Agreement.

(ix)      Contractor Reserve Account - The Reserve Account is an account established on the Principal's books in Contractor's name for the purpose of establishing a fund against which the Principal may deduct amounts on behalf of any Seller entitled thereto, all as described in subparagraphs 12(d), 12(e) and 12(f) below.

(b)      Commissions - As full and complete compensation for the services rendered by Contractor under this Agreement, each Seller (or Principal, on said seller's behalf) shall pay to Contractor, subject to the terms and conditions hereunder, a Commission in an amount (the

9

"Commission Amount") based upon the Commission/Advance Schedule in effect as of the time of sale, as attached. The total amount of the Advance (the "Advance Amount") with respect to each sale of a Non CO Unit shall be equal to the Commission Amount for such sale as set forth on the Commission Advance Schedule in effect as of the time of such sale. Attached hereto is an initial Commission/Advance Schedule covering the Lawai Project, which Commission/Advance Schedule may be revised from time to time by the Lawai Seller, or Principal and/or the Designated Affiliate, and upon each delivery to Contractor thereof, such revised Schedule shall be applicable to all sales occurring thereafter.

(c)     Payment of Commissions -

(i)     CO Units - As to all Booked Sales of CO Units the Commissions shall be payable, subject to the provisions of subparagraphs 12(d), 12(e) and 12(f) below, on the 1st and 16th (or, if either or both of the 1st and the 16th are not a business day, then on the immediately preceding business day) of each month ("Pay Day"). On each Pay Day, Contractor shall be paid commissions for all sales of CO Units which have become Booked Sales prior to the third day before said Pay Day (the "Cut-Off Day") and since the immediately preceding Cut-Off Day.

(ii)    Non CO Units - As to all Booked Sales of Non Co Units, the Advance shall be payable, subject to the provisions of sub-paragraphs 12(d), 12(e) and 12(f) below, on the Pay Day as follows:

(A)     For all sales of Non CO Units which become Booked Sales but no Closing occurs prior to the Cut-Off Day preceding said Pay Day and after the immediately preceding Cut-Off Day, eighty percent (80%) of the Advance Amount (the "Initial Advance") with respect to said sales;

(B)     For all sales of Non CO Units where Contractor has received the Initial Advance and where the Seller (or in the case of the Lawai Project, the Lawai Project Developer/Seller) receives two (2) installments of principal or principal and interest due under the Purchase Agreement for that Non CO Unit and the Closing has not occurred prior to the Cut-Off Day and after the immediately preceding Cut-Off Day, ten percent (10%) of the Advance Amount for said Sales; and

(C)     For all sales of Non CO Units where the closing occurs prior to the Cut-Off Day and since the immediately preceding Cut-Off Day, the amount by which the Advance Amount for said sales exceeds the total amount of all prior distributions of the Advance for said sales (said payment hereinafter called the "Final Advance Distribution").

(d)     Reserve Account - The Principal shall be entitled to withhold Ten Percent (10%) of any payment to Contractor of Commissions and of any distribution to Contractor of Advances (whether from the Principal, or any Designated Affiliate) to fund Contractor's Reserve Account; provided, however, that no such percentage shall be withheld during any period when the balance in Contractor's Reserve Account equals or exceeds the sum of Three Thousand Dollars (S3000.00).

The funds in Contractor's Reserve Account shall be subject to the deductions, setoffs and chargebacks provided herein.

The Reserve Account shall terminate and the balance in said account, if any, shall be paid to Contractor not later than thirty (30) days after the date that all Commissions with respect to sales of Units (both CO Units and Non CO Units) solicited prior to the termination of this Agreement become Earned Commissions.  If this Agreement is terminated, Contractor agrees that the Principal (on behalf of itself, Principal and each Designated Affiliate) may retain funds payable to Contractor which are necessary to bring the balance in the Reserve Account up to Three Thousand Dollars (S3,000).  Alternatively, in the event the Reserve Account, after termination of this Agreement, shows a negative balance (which balance shall be deemed to be sums owed to any Seller and for which the Principal is not retaining funds payable to Contractor in an amount sufficient to cover such balance), Contractor agrees to pay to the Principal (on behalf of itself, the Seller and each Designated Affiliate) on demand an amount sufficient to bring the negative balance to zero, failing which the Principal shall be entitled to include in any action it institutes or claim it makes to recover such amount all of its costs of collection, including its reasonable attorneys' fees.

For purposes of administrative simplicity, the Principal shall have the right to maintain and control the Contractor's Reserve Account on behalf of itself, and each Designated Affiliate. Additionally, the Principal shall have the right, at any time upon written notice thereof given to Contractor, to transfer to or any Designated Affiliate all of its obligations and rights with respect to Contractor's Reserve Account.

22

(e)    Chargebacks - In the event any Unit is returned to the Seller thereof, whether by a court order, or instrument of transfer, on or before said Seller's receipt, in good funds, etc., of six monthly payments of principal or principal and interest after the Closing under the Purchase Agreement, or the Closing of the sale of any Non CO Unit does not occur for any reason whatsoever, the Contractor shall be obligated to return all Commissions and Advances paid Contractor on account of the Purchase of said Unit (including that portion of any Commission or Advances deposited in Contractor's Reserve Account), and the return of said Commissions and Advances shall be made, at said Seller's option, in one or more of the following ways: (i) deduction from any Commissions or Advances, or both, due after the date of return of the Unit; (ii) deduction from Contractor's Reserve Account; or (iii) upon demand by said Seller, immediate payment by Contractor of the amounts due and should Contractor fail to pay same, the Seller, shall be entitled to include in any action it institutes or claim it makes to recover same all of its costs of collection, including reasonable attorneys' fees.

A Seller's (including Principal's) decision: (A) to demand, consent or acquiesce to, the return to said Seller of any Unit by a Purchaser, (B) to consent or acquiesce to the failure of the Closing of any Non CO Unit to occur or (C) to permit or allow the Closing of any Non CO Unit not to occur for any reason whatsoever, shall in no way result in any liability by said Seller to Contractor.

In the event a Seller, in the exercise of its discretion, makes any monetary compromise or concession to any Purchaser by reason of alleged misconduct of Contractor or failure to comply with, or breach of, any of the terms of this Agreement, Contractor agrees (1) that the amount of such compromise or concession may be charged against his/her Reserve Account and (2) amounts charged against Contractor's Reserve Account pursuant to this provision may exceed Commissions paid to or Advances distributed to, Contractor on the sale in question.

(f)    Disputes - Contractor agrees that each Seller, in its sole discretion, shall have the right to determine, in any dispute arising between Contractor and any other contractor or any employee of that Seller, the right to payment of Commissions or receipt of Advances, as the case may be, on Booked Sales, and Contractor further agrees to abide by and be bound by the Seller's decision in each such instance.

(g)    Covenants and Warranties - Contractor covenants and warrants to the Principal: (i) that he/she is a Real Estate Salesman/Broker duly licensed and in good standing with the appropriate regulatory agencies in the State of Hawaii (and further as a condition of Contractor's continued retainment, Contractor agrees to maintain said license(s) in good standing, at all times during the term hereof) and (ii) that he she is not a party to any agreement which subjects him/her to a non-

competition provision or other restriction with respect to (A) the nature of any services or business which he/she is obligated to perform or conduct under this Agreement, or (B) the disclosure or use of any information which, directly or indirectly, relates to the nature of the Principal's or any Shell-Related Entities' business or services to be rendered by Contractor under this Agreement.

13.    Taxation. It is expressly understood and agreed by Contractor that Contractor shall not be treated as an employee for federal tax purposes or for any other purposes.

14.    Indemnification. Contractor agrees to indemnify and save harmless the Principal, all of the Shell-Related Entities, each Designated Affiliate, and their respective partners, affiliates, subsidiary companies and their respective officers, directors, shareholders and employees from all claims, demands, penalties, suits or actions, and from any and all losses, costs and expenses in connection therewith, including attorney's fees through any appellate procedure, for (a) damages to persons and/or property, (b) for personal injury and/or death which may be suffered or sustained by any third party and (c) for any claims against or losses or liability of such indemnified party for any cause arising out of, or resulting from, Contractor's performance of or failure to perform his/her duties and obligations under this Agreement; any misrepresentation or false statement made by Contractor hereunder; or in the performance of his/her services hereunder; or Contractor's breach of any covenant, representation or warranty made herein, including a breach of any of the Restrictive Covenants. In the event that the Principal, any of the Shell-Related Entities or a Designated Affiliate is entitled to be indemnified pursuant to this Paragraph, the Principal shall be entitled to deduct the amount of said indemnity obligation from Contractor's Reserve Account hereunder and to pay said amount to the party entitled thereto. This Paragraph and its provisions shall survive the termination of this Agreement.

15.    Right to Investigate. Contractor agrees as follows:

(a)    The Principal and each Designated Affiliate shall have the right through its agents, employees, consultants or designated representatives to observe Contractor and investigate, otherwise duplicate and collect a record of Contractor's actions and performance under this Agreement. Contractor freely gives his/her consent and authorization for the Principal and each Designated Affiliate to prepare such a record or otherwise investigate and verify Contractor's performance in order to maintain and protect the high standards and overall integrity of the sale process as established by the Principal;

(b)    Contractor agrees that the foregoing record hereby authorized to be created may include, without limitation, video recordings, audio recordings, photographs, any mechanical reproduction process and any direct or indirect observation of sales presentations made by

13

Contractor or in Contractor's presence to prospective Purchasers during the term of this Agreement. Neither the Principal, nor any Designated Affiliate shall be required to seek or receive any further consent or authorization to record, investigate or review Contractor's sales presentations or Contractor's involvement in any marketing effort; and

(c)    Contractor further agrees that no prior notice of such recording, investigation or review shall be necessary or required. If the recordings, investigations or reviews made or conducted by or for the Principal, or any Designated Affiliate pursuant to this express authorization demonstrate a violation by Contractor of this Agreement or of any of the policies or procedures of the Principal, or any Designated Affiliate, that party may use such information as the basis for a termination under this Agreement.

Notwithstanding the foregoing, neither the Principal, nor any Designated Affiliate shall be entitled to utilize any of the above authorized record in any of its sales or marketing materials without the prior written consent of Contractor, which consent shall not be unreasonably withheld, delayed or qualified (and, specifically, Contractor shall not be entitled to condition his/her consent upon the payment of any fee or other financial consideration).

16.    Code of Ethics. Contractor agrees to abide by those provisions contained in the Code of Ethics as established by the American Resort Development Association ("ARDA") as of February 20, 1986. In the event Contractor does not abide by said provisions, the Principal, or any Designated Affiliate may use such information as the basis for a termination under this Agreement. In addition, if not previously obtained, Contractor shall obtain, within ninety (90) days of the date hereof, the ARDA Education Institute Certification and Contractor shall, during the term of this Agreement, take such steps as are necessary to maintain said certification in good standing.

17.    Assignment and Benefit. Contractor's rights and obligations under this Agreement are personal and not assignable. This Agreement shall be binding upon and inure to the benefit of the Principal, any Shell-Related Entities and each Designated Affiliate and their respective successors and assigns. The provisions of Paragraphs 5, 6, 7, 8, 9(f), 11 and 14 and other provisions of this Agreement to the extent that they relate to said Paragraphs also inure to the benefit of, and may be enforced by, each of the Shell-Related Entities.

18.    Choice of Law. This Agreement shall be construed according to the laws of the State of Hawaii.

19.    Prior Agreements. This Agreement supersedes all prior agreements and understandings between the Partnership, the Principal, or the Venture and Contractor and this Agreement expresses the whole and entire agreement between the parties with reference to Contractor's service and this Agreement and Contractor's duties

hereunder cannot be modified, changed, or rescinded by any oral or verbal promise by whomsoever made; nor shall any written modification, change or rescission of this Agreement or Contractor's duties hereunder be binding on Contractor until such written modification shall have been approved in writing by those individuals designated, from time to time, by the Principal, and/or each Designated Affiliate, as the case may be, as having the power to bind that party hereunder.

20.    <u>Survival of Provisions</u>.  The provisions of paragraphs 4, 5, 6, 7, 8, 9(d), 12(d), 12(e), 12(f), 12(g), 12(h), 13, 14, 15, 18, 19, 21 and 22 herein shall survive termination of this Agreement.

21.    <u>Construction</u>.  The pronouns used in this Agreement shall include the masculine, feminine, neuter, singular and plural wherever the context and facts require such construction.

22.    <u>Severability</u>.  Each section, paragraph, term and provision of this Agreement, and each portion thereof and the application of each to each party and circumstance, shall be considered severable and if for any reason any such portion of this Agreement or the application thereof to any party or circumstance is held to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which the Principal, any of the Shell-Related Entities, a Designated Affiliate or any one or more of them is a party, that ruling shall not impair the operation of, or have any other effect upon, the other portions of this Agreement as may remain otherwise intelligible or the application of such portion to other parties and circumstances which shall continue to be given full force and effect and bind the parties hereto.  Contractor agrees that if any provision hereof or the application of any provision to any particular part or circumstance shall be adjudicated to be invalid or unenforceable in whole or in part, such modifications made to this Agreement as a result of such adjudication shall be effective only in the particular jurisdiction in which such adjudication is made. To the extent any provision hereof or the application of any provisions to any particular party or circumstance is deemed unenforceable by virtue of its scope but may be made enforceable by limitations thereon, the parties agree that the same shall be enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction in

which the enforcement is sought, the parties hereby authorize any court of competent jurisdiction to modify any of the Restrictive Covenants to the extent necessary to make the same enforceable.

      IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

                      PRINCIPAL:

                      SHELL DEVELOPMENT CORPORATION-Lawai, , a Hawaii corporation

                      BY:                                          "Agent"

                                      Washington
                      LAWAI BEACH REALTY CO., INC., a Hawaii corporation

                      By:                                          "LBR"

                      CONTRACTOR:

ATTACHMENT TO INDEPENDENT CONTRACTORS CONTRACT -
GENERAL SALES MANAGER: _____
Norm Hansen

For services rendered in supervising all aspects of Sales Administration and Operation, the contractor shall receive an $8,000.00 per month advance. The contractor will be paid 1.5% of all sales volume as determined on an accounting basis for each month.

Approved:   Shell Development Corporation - Lawai, a Hawaiian Corporation

By _____   Date _Sept. 1, 1993_

Lawai Beach Realty Co., Inc., a Washington Corporation

By _____   Date _Sept. 1, 1993_

ATTACHMENT TO INDEPENDENT CONTRACTORS CONTRACT

SALES MANAGER _____

                        Norman Hansen

For the fiscal year commencing October 1, 1994, through the remainder of the sell-out the Alii
and Coral Buildings contractor Commission is equal to 1.25% of on-site sales.

During the fiscal year commencing October 1, 1994, contractor Commissions on Banyan Building
sales are equal to 1.25% of on-site sales.

Contractor is entitled to a bonus equal to .25% of sales for the period October 1, 1994 through
December 31, 1994, which will be paid April 30, 1995 if the following two conditions are met:

    1.   Net sales of Shell Development Corporation - Lawai equal or exceed the aggregate
         budgeted net sales for the period October 1, 1994 through March 31, 1995

    2.   The actual net close rate achieved equals or exceeds the net close rate reflected in the
         Annual Business Plan for the period October 1, 1994 through March 31, 1994.

Compensation for the contractor is to be adjusted and agreed to each fiscal year for the inclusion
in the Annual Business Plan.

APPROVED: SHELL DEVELOPMENT CORPORATION - LAWAI, a Hawaiian Corporation

By_____
Date:    10 - 21 - 94

EXHIBIT

B



# Lawai Beach Resort
### Shell Development Corporation - Lawai

October 21, 1994

Mr. Norm Hansen
4011 Pai Street
Kalaheo, Hi. 96741

Re:   Shell Development Corporation - Lawai

Pursuant to the marketing and sales agreement between Metropolitan Hawaii and Shell Development Corporation - Lawai, dated July 6, 1992, Shell Development Corporation - Lawai will be entitled to a bonus upon sellout. Participation in said bonus will be up to 50% for the senior management of Shell Development corporation - Lawai. Shell Development corporation - Lawai's share shall be divided among the senior management as determined by Project Director, Francis Hutchinson, with the final approval by Perry Snyderman and Sheldon Ginsburg.

By this exhibit, Norm Hansen and/or his heirs will be entitled to 25% of the Shell Development Corporation - Lawai's share, Pending final approval at the completion of contract by Perry Snyderman and Sheldon Ginsburg.

APPROVED BY: _____
Francis G. Hutchison, Shell Development Corporation - Lawai



**EXHIBIT**
C

## MEMORANDUM
The Shell Group, Inc.
40 Skokie Boulevard, Suite 350
Northbrook, IL  60062
Tel: (708) 564-4600  Fax: (708) 564-0703

Date:      April 10, 1995

To:        Norm Hansen

CC:        ____  Perry J. Snyderman
           ____  Sheldon H. Ginsburg
           ____  Robert M. Richey
           ____  Rusty Hutchinson

From:      Craig J. Goldstein, ext. 154

Re:        **Shell Development Corporation-Lawai
           Compensation - Phase II**

---

The following is a recap of our conversations with respect to your compensation for the period from the commencement of the Phase II (Banyan Building) operation through September 30, 1996. I believe this recaps the issues we discussed as well as the items which Rusty has raised.

I would appreciate your reviewing this and initialing below noting your understanding of the program. I will have our legal counsel draft the appropriate agreement during the next few weeks.

The program is as follows:

1.   You will be paid an override of 1.25% of all sales closed for sales centers located on the Island of Kauai. This override is limited to a maximum of $21,000 per calendar month.

2.   On a monthly basis you are subject to a $2,000 deduction in your override, which means if you exceeds the maximum, the deduction is from the $21,000 maximum to $19,000. The deduction will be made if the percentage of Net Sales less expenses for marketing administration, marketing program expenses, sales operations, sales administration and the general and administrative expense items ("Net Operating Income Percentage"), per attached Schedule, actually incurred per the financial statements is less than the budgeted percentage.

EXHIBIT

D

Memo to Norm Hansen
April 10, 1995
Page Two

3.  On a quarterly basis, upon receipt for each calendar quarter's financial statement, a "look back" test will be performed against the potential $2,000 deduction. Upon receipt of the final financial statements for the quarter, a determination will be made on a quarterly basis (March 31, June 30, Sept. 30 and December 31) if the $2,000 per month deduction of Net Operating Income Percentage test has been met or not. If the Net Operating Income Percentage exceeds the budgeted parameters, then a check will be written within 10 days for any months in which a deduction was made. Conversely, if for the calendar quarter the Net Operating Income Percentage test is not met, then a deduction will be made on your next paycheck for any months in which a deduction was not previously made within the quarter. For example,

|  | Deduction Amount |
|---|---|
| July | $2,000 |
| August | -0- |
| Sept. | 2,000 |

If, for the quarter ended in the above example, in September the actual Net Operating Income Percentage exceeded the budgeted amount based on the definition in Item 2 above, you would receive a check in the amount of $4,000, repaying you the two $2,000 deductions previously made. However, if in September of the above example, the actual operation failed to meet the budgeted Net Operating Income Percentage based on the definition in Item 2 above, you would have $2,000 (for the month which you did not receive a deduction) deducted from your next check.

4.  You shall participate in a back-end fee participation based on a definitional write-up to be received within 30 days of this memorandum which will be subject to the recommendation of Rusty Hutchinson and at the discretion of Perry J. Snyderman and Sheldon H. Ginsburg.

If you have any further questions, please feel free to contact me.

Note:  The defined terms for this letter are to be interpreted solely for the purposes of compensation agreements and in accordance with the attached Schedule.

Attachment
CJG:kl #eg995(220
FILE ID: LAWAI PERS/Hansen

## ATTACHMENT TO CRAIG J. GOLDSTEIN
## MEMO DATED 4/10/95

| | | |
|---|---|---|
| Gross Sales | $110.00 | 110% |
| Less Rescissions | $ 10.00 | 10% |
| Net Sales | $100.00 | 100% |
| Less Operating Expenses: | | |
| Marketing Admin. | $ 15.00 | 15% |
| Marketing Operations | 3.00 | 3% |
| Sales Administration | 2.00 | 2% |
| Sales Operating | 20.00 | 20% |
| General & Administrative | 10.00 | 10% |
| Total Operating Expenses | $ 50.00 | 50% |
| Net Operating Income | $ 50.00 | 50%[1] |

(1) Net Operating Income Percentage

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made and entered into this _27th_ day of _June_, 1995, by and between **SHELL DEVELOPMENT CORPORATION-LAWAI**, a Hawaii corporation ("Employer") whose business address is c/o The Shell Group, 40 Skokie Boulevard, Suite 350, Northbrook, Illinois, 60062 and **NORMAN HANSEN** ("You") whose address is _4011 Poi Street_. _Kalaheo, Hi 96741_

## W I T N E S S E T H:

**WHEREAS,** Employer and Metropolitan Mortgage Hawaii, Inc., a Hawaii corporation ("Metropolitan"), have heretofore entered into that certain Marketing and Management Agreement (the "Phase I M&M Agreement") dated July 6, 1992 pursuant to which Employer was engaged as Metropolitan's agent to manage and operate all aspects of marketing, sale, management, operation and development of an existing 110 unit resort time sharing project located on the Island of Kauai, Hawaii, and known as the Lawai Beach Resort (the "Phase I Project"); and

**WHEREAS,** Employer and Metropolitan have heretofore entered into a separate Marketing and Management Agreement dated November 15, 1994 (the "Phase II M&M Agreement") pursuant to which Employer has been engaged to manage and operate all aspects of marketing, sale, management, operation, construction and development of an additional 60

EXHIBIT

E

residential time share units and five commercial units to be constructed on a parcel located adjacent to the Phase I Project (the "Phase II Project"); and

**WHEREAS**, pursuant to that certain verbal agreement (the "Phase I Employment Agreement") between Employer and You, Employer engaged You to be the "Director of Sales/Kauai" of the Phase I Project and the Phase I Project is substantially sold out and You have performed substantially all of Your duties and obligations under the Phase I Employment Agreement; and

**WHEREAS**, Employer desires to engage You, and You wish to be in the employ of Employer, as the Director of Sales/Kauai for the Phase II Project;

**NOW, THEREFORE**, in consideration of the mutual promises set forth in this Agreement, You and Employer agree as follows:

I.    **Duties**.

A.    Employer hereby employs You to perform the duties of Director of Sales/Kauai for the Phase II Project.  As such, You shall be the individual on behalf of Employer (in Employer's capacity as agent of Metropolitan) in charge of sales operations and sales administration for the sale of Intervals in the Phase II Project on the Island of Kauai.  You shall

perform such duties as may from time to time be reasonably assigned to You by the Chairman, the Vice Chairman, the Vice President-Finance and/or the Vice President-Project Manager of Employer, including the duties described on Exhibit A attached hereto and made a part hereof. With respect to incurring expenses on behalf of Employer and executing contracts, leases, and other instruments in the name of Employer, as agent of Metropolitan, and with the intent of binding Metropolitan, You may do so only if the expense is, or the terms of the contract are, as the case may be, within the parameters of the then current budget of Employer or if the Chairman, Vice-Chairman, or Vice President-Finance of the Employer has specifically authorized Your execution thereof.

B.    Your duties shall be performed on the Island of Kauai and in other locations in the State of Hawaii, except for temporary assignments elsewhere, which temporary assignments shall not exceed a cumulative total of more than two months per year.

C.    You shall confer with, advise and assist Employer as reasonably required and work cooperatively with all executive officers of Employer.

D.    Throughout the term of this Agreement, You shall devote all of Your time, attention and energy to perform expeditiously and efficiently Your obligations hereunder (and any remaining obligations under the Phase I Employment Agreement). In connection therewith and in addition to performing the aforesaid duties on behalf of Employer, You shall also, to the


extent reasonably requested by Employer, perform said duties on behalf of any Affiliate (as hereinafter defined).

E.      Nothing contained herein shall be deemed to create a relationship of partnership or joint venture between the parties. The relationship between You and Employer is and shall be that of employer/employee and You shall not represent otherwise.

II.   **Compensation**.

A.      **Base Compensation**.

1.      **Monthly Compensation**. Employer agrees to pay You a monthly compensation (hereinafter called the "Monthly Compensation") equal to the lesser of (a) one and one quarter percent (1.25%) of all sales of Intervals in the Phase II Project which are generated from sales centers located on the Island of Kauai and which "close" (as hereinafter defined) during the subject month and (b) Twenty One Thousand and no/100 Dollars ($21,000.00), which Twenty One Thousand and no/100 Dollars ($21,000.00) amount may, in Employer's sole discretion, be increased to account for inflation. For purposes of the foregoing, the Monthly Compensation shall be subject to the following terms and conditions:

(1)     The amount of Monthly Compensation due for each calendar month shall be subject to certain adjustments (based upon a comparison of actual "Kauai NOI Percentage" to budgeted "Kauai NOI Percentage") calculated both monthly and quarterly, all as more particularly described below in Paragraph II.A.2.

(2)     For purposes for calculating the amount due under clause II.A.1.(a) above, the purchase price as set in the purchase and sale agreement for each Interval whose sale is closed during the relevant time period shall be utilized.

(3)     A sale shall be deemed "closed" (or a sale shall "close") in that time period during which the proceeds of such sale are disbursed to or for the benefit of the seller of the Interval and title to that Interval is transferred to the Purchaser thereof.

(4)     The foregoing Monthly Compensation for each calendar month shall, subject to the adjustments described in Paragraph II.A.2 below, be paid to You twice monthly during the following month (on the 15th or if not a business day, then on the immediately preceding business day and last business day of that month) and shall also be less normal withholding, FICA and other taxes.

2.     **Adjustments to Monthly Compensation.**  The foregoing Monthly Compensation shall be subject to a Two Thousand and no/100 Dollars ($2,000.00) per month deduction if

actual Kauai Net Operating Income (as hereinafter defined) as a percentage of the actual Kauai Net Sales (as hereinafter defined) (said percentage is hereinafter called the "Kauai NOI Percentage") for the relevant time period exceeds budgeted Kauai Net Operating Income as a percentage of budgeted Kauai Net Sales for that time period as set forth on the then internally approved budget for the Phase II Project (the initially approved internal budget for the Phase II Project is attached hereto as Exhibit B and the then current budget, as approved from time to time, is hereinafter called the "Budget"). As used herein, (i) "Kauai Net Sales" for any time period shall mean the amount by which (a) the dollar amount (as set forth in the purchase and sale agreement for each Interval) of all sales (1) made during the relevant time period which are not rescinded prior to the expiration of the statutory rescission period (a sale is deemed made in that time period during which the purchase and sale agreement for such sale is executed and all necessary funds are paid by the purchaser) and (2) made at or from one of the sales centers located on the Island of Kauai exceed (b) the dollar amount of all sales for which the Interval was returned to Metropolitan during that time period and the sale of that Interval was closed during the then current calendar year, and (ii) "Kauai Net Operating Income" for any time period shall mean the amount by which (a) the Kauai Net Sales for that time period exceed (b) the sum of the expenses for marketing administration, marketing operations, sales operations, sales administration and general and administrative expenses incurred in, at or from, or otherwise attributable to, the Kauai sales centers for that time period. In order to determine whether Employer is entitled to make any deductions to Monthly Compensation, the actual Kauai NOI Percentage shall be calculated both monthly and for each calendar quarter (ending on

March 31, June 30, September 30, and December 31 of each year). Such calculations shall result in the following adjustments to Monthly Compensation:

(i)     For each calendar month where the actual Kauai NOI Percentage for any calendar month is less than the budgeted Kauai NOI Percentage for that month, Two Thousand and no/100 Dollars ($2,000.00) shall be deducted from the Monthly Compensation for that month (hereinafter called a "Monthly Deduction");

(ii)    For each calendar quarter where the actual Kauai NOI Percentage is less than the budgeted Kauai NOI Percentage for that quarter, Employer shall be entitled to deduct from Monthly Compensation the amount by which Six Thousand and no/100 Dollars ($6,000.00) exceeds the total amount of Monthly Deductions theretofore taken by Employer with respect to the calendar months falling within that quarter; and

(iii)   For each calendar quarter where the actual Kauai NOI Percentage is equal to or greater than the budgeted Kauai NOI Percentage for that quarter, Employer shall reimburse You for all Monthly Deductions theretofore taken by Employer with respect to the calendar months falling within that quarter.

For purposes of calculating Monthly Compensation, Monthly Deductions, and "quarterly adjustments", the following shall apply: (A) Employer shall, prior to the commencement of each fiscal year during the term of this Agreement (i.e., October 1 to September 30), provide You with several copies of the Exhibit B - Budget to be used for that year and cause a copy thereof to be initialled and attached to this Agreement; (B) the determination of Kauai Net Sales and Kauai Net Operating Income for each month and calendar quarter as made by the internal accountants for the Phase II Project shall be conclusive and binding on the parties; (C) Employer shall be entitled to make Monthly Deductions and quarterly adjustments on the next payment of Monthly Compensation immediately following the determination that a deduction or adjustment is to be made; and (D) in order to be eligible for Monthly Compensation for a month or for an adjustment/reimbursement payment at the end of a quarter, this Agreement must be in effect (i.e., not terminated) as of the last day of that month or quarter, as the case may be.

B.    **Bonus**.    You shall be entitled to receive bonus compensation ("Bonus") in accordance with the following terms. Under the Phase II M&M Agreement, Employer receives a "Fixed Fee" and a "Participation Fee". The "Participation Fee" is based upon the "Net Cash Flow" which is generated from the sale of Intervals in, and from the operation of, the Phase II Project both during the term of the Phase II M&M Agreement and thereafter, to the extent that the Net Cash Flow is not received until after the termination of the Phase II M&M Agreement. In addition, under the Phase II M&M Agreement, a portion of the amounts paid to Employer as Fixed Fee is to be credited against the Participation Fee and only after such credit has been fully applied, will Employer receive any sums as Participation Fee (such amounts as Employer

is actually entitled to be paid as Participation Fee, after said credit has been fully applied, is hereinafter called the "Back-End Fee"). Employer has agreed to use forty to forty-five percent (40% to 45%) of the Back-End Fee as a bonus pool for senior management. Based upon recommendations received from senior management, but without being bound thereby, the Chairman of the Board and the Vice Chairman shall, in their sole and absolute discretion, determine what portion of said bonus pool shall be paid to You as Bonus. You hereby acknowledge, understand and agree (1) that You shall receive no Bonus if there is no Back-End Fee paid to Employer under the Phase II M&M Agreement; (2) that the amount of any Bonus to be paid to You shall be determined in the sole and absolute discretion of the Chairman of the Board and the Vice Chairman, acting together; (3) that the "Net Cash Flow" of the Phase II Project cannot be determined or calculated until all debts, loans and other obligations attributable to the Phase II Project have been fully satisfied and all Intervals in the Phase II Project are sold (with sales closed) or time share sales are abandoned by Metropolitan; (4) that since most Intervals will be sold with Metropolitan providing purchase money financing which would extend as long as seven (7) years, it is probable that the determination of whether there exists any Bonus and the payment thereof will not occur until some time after completion of sales of Intervals in the Phase II Project and, therefore, You would no longer be actively employed by Employer under this Agreement; and (5) that, as a further consequence of the fact that Metropolitan will be receiving a substantial amount of purchase money financing from the Phase II Project, the amount of "Net Cash Flow" generated from the Phase II Project, as well as the timing of the receipt of said "Net Cash Flow" could be materially affected by any decision made by Metropolitan to liquidate said purchase money financing (it being expressly understood

that the decision to liquidate said purchase money financing is within the total and complete discretion of Metropolitan).

C.    **Insurance and Vacation**. You shall be included in any medical, dental, disability and life insurance plans offered to the employees of Employer. You shall be entitled to three (3) weeks of paid vacation every year (which three (3) weeks includes sick days and other miscellaneous time off), which vacation time is deemed earned pro-rata during the year and the dates for which must be cleared with Employer in advance.

III.    **Definitions**.

A.    "Affiliate" means the parent or any subsidiary of Employer or any entity which owns or controls, or is owned or controlled by Employer or is a joint venture partner of Employer and there is a commonality of ownership with Employer, and for purposes hereof "owns" or "owned" shall mean having a direct or indirect ownership or equity interest not necessarily a majority or controlling interest.

B.    "Pay Period" means the period beginning with the commencement of employment or with the first day after the prior Pay Period, as the case may be, and ending approximately five (5) days prior to the 15th or the last day of each month, as the case may be.

C.    "Sales Materials" means all sales manuals, materials, price lists, samples, lists and records concerning prospective purchasers or owners of Intervals, copies of documents, mailing lists, and all other personal property given to You by Employer, Metropolitan or any Affiliate.

D.    "Interval" means a time-share or interval ownership estate in any apartment, condominium, hotel, motel, cooperative, or any other residential, commercial or recreational property.

E.    "With Cause" means termination due to:

(1)    Your violation of any material covenant or material agreement contained in Paragraphs V or VI of this Agreement;

(2)    Any misappropriation of funds or property of either the Phase I Project or the Phase II Project by You;

(3)    Your conviction of a felony or of any crime involving moral turpitude;

(4)    Your failure or refusal to perform the reasonable and material duties assigned to You hereunder or Your failure to perform any material covenant or agreement on Your part contained in this Agreement (other than those set forth in Para-

graphs V or VI below), after thirty (30) days prior written notice from Employer setting forth in reasonable detail the instance(s) of such failure or refusal; or

(5)    Your engagement in a course of illegal or improper conduct tending to place You or Employer, Metropolitan, any Affiliate, the Phase I Project or the Phase II Project in disrepute or otherwise to reflect adversely upon Employer, Metropolitan, any Affiliate, the Phase I Project, or the Phase II Project.

## IV.    Term of Agreement.

A.    Term.  The term of this Agreement shall be deemed to have commenced on the date when the term of the Phase II M&M Agreement commences and shall expire, unless sooner terminated as provided herein, on the first to occur of (1) June 30, 1998 and (2) on the last day of that calendar month during which ninety five percent (95%) of the Phase II Project's total number of Intervals are sold and closed.  Upon the expiration of the term of this Agreement, as aforesaid, Employer shall remain obligated to pay Bonus as if such expiration had not occurred.

B.    Termination.

1.    You may terminate this Agreement and the employment hereunder at any time upon not less than thirty (30) days' prior written notice of resignation to Employer.

2.    Employer may terminate this Agreement at any time, With or Without Cause, upon notice to You.

3.    In the event that the Phase II M&M Agreement is terminated for any reason, this Agreement shall automatically terminate concurrently therewith.

C.    **Compensation upon Early Termination**.

1.    If this Agreement is terminated as a result of Your death or Your permanent disability (being defined as set forth in Paragraph X below) or is terminated by Employer Without Cause, You shall receive: (A) any Monthly Compensation earned prior to the date of termination, subject to Employer's right to make Monthly Deductions and quarterly adjustments; and (B) Bonus calculated and paid in the same manner as provided in Paragraph II.B. above.

2.    If this Agreement is terminated by Your resignation or by Employer With Cause, You shall forfeit all rights to the Bonus (and, consequently, You shall be obligated to reimburse Employer for all Bonus theretofore paid to You), but You shall be entitled to receive all Monthly Compensation earned prior to the effective date of termination (subject to Employer's right to make Monthly Deductions and quarterly adjustments); provided, however, that all such "final compensation" also shall also be subject to set-off by Employer for expenses incurred by Employer arising from the cause

for Your termination and for satisfaction of Your obligation to reimburse Employer for all Bonus theretofore paid to You.

3.      Notwithstanding anything herein which may appear to be to the contrary, any Bonus due to You upon early termination in accordance with the foregoing shall not be payable to You (or Your estate) until such time as Employer would otherwise be obligated to pay such Bonus hereunder if such early termination had not occurred.

V.      **Trade Secrets.**

You hereby acknowledge that Employer will be adopting and utilizing, with each such Affiliate's consent, many of the trade and business practices used by Employer's Affiliates in other time-sharing projects, together with those trade and business practices used by Employer for the Phase I Project (all of which shall be treated as trade secrets under this Agreement), as well as developing and implementing other additional and different trade and business practices for the Phase II Project.   You shall not during the term of this Agreement or after its termination, at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation, any information concerning any matters affecting or relating to the business of Employer, Metropolitan or any Affiliate for whom You perform any services (a "Subject Affiliate"), including without limiting the generality of the foregoing, any names of or information concerning employees or agents of Employer, Metropolitan or any Subject Affiliate; Purchasers or prospective Purchasers of any Intervals; the

prices at which Employer, Metropolitan or any Subject Affiliate sells, intends to sell or has sold any Intervals; or any other information concerning the business of Employer, Metropolitan or any Subject Affiliate, the manner in which each of said parties conduct their respective operations, their respective plans, procedures, marketing programs, documents, agreements, and all other data; You hereby acknowledging and agreeing that (1) the resort time-sharing industry in which Employer, Metropolitan and the Affiliates compete is a highly specialized market; (2) the identity and particularized requirements of the customers of, and Purchasers and prospective Purchasers from, Employer, Metropolitan and Subject Affiliates and the manner in which they are identified and generated are not generally known in the resort time-sharing industry; and (3) Employer, Metropolitan and Subject Affiliate(s) each have a proprietary interest in (a) all documents and information concerning their respective employees, agents, customers, prospective Purchasers, and Purchasers; (b) the prices at which any of them sells, intends to sell or has sold any Intervals or other services or goods which are related to, or are in connection with, the operation of a resort time-share project; (c) the manner in which each of Employer, Metropolitan and each Subject Affiliate conducts its operation; and (d) the plans, procedures, marketing programs, documents, agreements, form documents and agreements, and all other data of Employer, Metropolitan and each Subject Affiliate, all of which proprietary documents and information are highly confidential and constitute trade secrets. The parties hereby acknowledge and agree that any breach of the terms of this Paragraph V shall be a material breach of this Agreement.

VI.   **Covenant Not to Compete**.

Except as expressly provided in the last sentence of this Paragraph VI, You shall not, for one (1) year immediately following the termination of this Agreement, regardless of who initiated the termination, engage, directly or indirectly, in the selling of, or the procuring of Purchasers for, Intervals located in the "Restricted Area" (as hereinafter defined) nor shall You be interested, directly or indirectly, in any manner, as partner, officer, director, stockholder, advisor, employee or in any other capacity in any business operating, directly or indirectly, in the Restricted Area and competitive with, or similar to, any of the businesses operated or conducted by Employer, Metropolitan or any Subject Affiliate; provided, however, that nothing herein contained shall be deemed to prevent or limit Your right to invest any of Your surplus funds in the capital stock or other securities of any corporation whose stock or securities are registered with the Securities and Exchange Commission and are regularly traded on any public exchange.  As used in this Agreement, the term "Restricted Area" shall mean the Island of Kauai and if and only if You should perform any services for one or more Affiliates (called herein "Subject Affiliates"), then for each Subject Affiliate, the Restricted Area shall include the island on which said Subject Affiliate's project is located or You perform Your services, or both, as is applicable.  Notwithstanding anything herein to the contrary, the foregoing covenant not to compete shall not apply if (a) this Agreement is terminated because the Phase II Project is sold out, (b) at the time of such sell-out, You are not then performing any services for any Subject Affiliate, and (c) no Affiliate of Employer is then actively developing and marketing a time-share project in the Restricted Area.

VII.    Modification of Restrictive Covenants.

In entering into this Agreement and establishing the foregoing covenants with respect to confidential information and competition contained in Paragraphs V and VI above (hereinafter collectively the "Restrictive Covenants"), the parties have attempted and intend to limit Your right to disclose information and compete only to the extent necessary to protect Employer, Metropolitan and each Subject Affiliate from unfair competition.   The parties recognize, however, that reasonable people may differ in making such a determination.   Therefore, the parties hereby agree that if the scope or enforceability of any of the Restrictive Covenants, as set forth herein, is found, by a court of competent jurisdiction, to be too broad or otherwise unenforceable, such court, in recognition of the intent of the parties as aforesaid, shall modify and enforce such Restrictive Covenants to the extent it believes to be reasonable under the circumstances existing at that time.

VIII.    Remedies.

You hereby acknowledge and agree that the period of time and geographical limitations set forth in Paragraph VI are reasonable and that the other provisions and covenants set forth in this Agreement, including, without limitation, the Restrictive Covenants, are necessary to protect the business and good will of Employer, Metropolitan and each Subject Affiliate.   You hereby further acknowledge and agree that a breach of any of the Restrictive Covenants will

result in irreparable and continuing damage to Employer, Metropolitan and each Subject

Affiliate, for which money damages cannot provide adequate relief and, consequently, in the

event of any breach of any of the Restrictive Covenants, Employer, Metropolitan and each

Subject Affiliate, or any of them, to the extent appropriate, shall, in addition to any other right

or remedy available at law or in equity, be entitled both (1) to a preliminary or permanent

injunction in order to prevent the continuation of such harm and (2) to liquidated damages in the

amount of Five Hundred Dollars ($500.00) per day, for each day or part thereof that You

continue to so violate said Restrictive Covenant. It is recognized and agreed that damages in

such event are difficult to ascertain, though great and irreparable. Nothing in this Paragraph

VIII shall be construed to prohibit Employer, Metropolitan and each Subject Affiliate from

pursuing any one remedy to the exclusion of any other remedy, but, rather, all remedies shall

be deemed cumulative and non-exclusive.

IX.    **Covenants and Restrictions**.

A.    **Exclusive Employment**. You shall devote, during business hours, all of Your

time, attention, knowledge and skills solely to the business and interests of Employer,

Metropolitan and Subject Affiliates, and Employer, Metropolitan and Subject Affiliate(s) shall

be entitled to all of the benefits, profits or other issue arising from or incident to all of Your

work, services, and advice rendered in connection with such business. You shall not during the

term hereof be interested directly or indirectly, in any manner, as a partner, officer, director, stockholder, advisor, employee or in any other capacity in any other business which is developing, marketing or selling time-share or interval ownership facilities or condominiums; provided, however, that nothing herein contained shall be deemed to prevent or limit Your right to invest (i) any of Your surplus funds in the capital stock or other securities of any corporation whose stock or securities are registered with the Securities and Exchange Commission and are regularly traded on any public exchange, or (ii) as a passive investor in other businesses not similar to the business of Employer, Metropolitan or any Affiliate.

B.    **Sales Materials.**  If this Agreement is terminated, You agree to promptly return all Sales Materials to Employer.

C.    **Indemnification**.  You agree to indemnify Employer, Metropolitan and all Affiliates and their respective partners, officers, directors, shareholders, employees and agents from all claims, demands, liabilities, losses, costs and attorney's fees incurred as a result of Your misconduct or failure to perform Your duties under this Agreement.

X.    **Disability**.

If You are unable to perform substantially all of Your duties hereunder by reason of illness or incapacity, You shall be paid for a period of three (3) months. In the event said

incapacity is then certified by a physician acceptable to both parties as total and permanent disability or in the event that such inability results in Your not so performing for an aggregate period of 90 days during any twelve (12) month period, Your employment shall be considered as having terminated as of the last day of said three (3) month period or said 90th day, as the case may be, and You shall thereafter be compensated in accordance with the provisions of Paragraph IV.C.1.

XI.    **Attorney's Fees**.

In the event either party brings suit to enforce the rights and obligations set forth in this Agreement, the prevailing party in such suit shall be entitled, in addition to recovering damages sustained thereby, or obtaining injunctive relief, or both, as the case may be, to recover all expenses incurred, including court costs and reasonable attorneys' fees, as part of the judgment or settlement.

XII.   **Assignment**.

A.    If Employer, Metropolitan or any Affiliate acquires, operates, manages, markets, sells or controls any resort condominium or resort time-sharing project other than the Phase I Project or the Phase II Project (hereinafter called an "Other Project"), or in the event Employer

or any Affiliate assigns its interests under the Phase II M&M Agreement or in any Other Project to another partnership or corporation, then the rights and duties of Employer or any Affiliate, as the case may be, may be assigned to and assumed by such partnership or corporation, whereupon Employer, Metropolitan and all Affiliates shall be released from all obligations arising from and after the date of such transfer.

B.    Your rights, benefits and duties under this Agreement are personal to You and may not be voluntarily or involuntarily alienated, assigned, delegated or transferred and any attempted assignment thereof shall be null and void; provided monies due, owing and unpaid to the extent not subject to setoff, shall inure to Your benefit and to the benefit of Your personal representatives, successors and assigns.

XIII.    **Notices**.

Notices to Employer or any Affiliate shall be in writing and sent by registered or certified mail, return receipt requested, and addressed to said party in care of Employer at Employer's address set forth in the first paragraph of this Agreement.  Notices to You shall be in writing, hand-delivered to You or sent by registered or certified mail, return receipt requested, and addressed to You at Your address set forth in the first paragraph of this Agreement.  Either party may change its address for purposes of notices under this Agreement by giving the other party written notice thereof in accordance with the terms of this Paragraph XIII.

XIV.　**Merger and Modification**.

This Agreement expresses the entire agreement between You and Employer with respect to the Phase II Project and supersedes all prior agreements between You and Employer regarding the Phase II Project, including, without limitation, all verbal discussions.　The terms of this Agreement cannot be modified by verbal promise, but only in a writing executed by You and Employer.

XV.　**Severability**.

Each section, paragraph, term and provision of this Agreement, and each portion thereof and the application of each to each party and circumstance, shall be considered severable and if for any reason any such portion of this Agreement or the application thereof to any party or circumstance is held to be invalid, contrary to, or in conflict with, any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which Employer, Metropolitan, any Affiliate or any one or more of them is a party, that ruling shall not impair the operation of, or have any other effect upon, the other portions of this Agreement as may remain otherwise intelligible or the application of such portion to other parties and circumstances which shall continue to be given full force and effect and shall continue to bind the parties hereto.　You agree that if any provision hereof or the application of any provision to any particular party or circumstances shall

be adjudicated to be invalid or unenforceable in whole or in part, such modifications made to this Agreement as a result of such adjudication shall be effective only in the particular jurisdiction in which such adjudication is made. To the extent any provision hereof or the application of any provision to any particular party or circumstance is deemed unenforceable by virtue of its scope but may be made enforceable by limitations thereon, the parties agree that the same shall be enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction in which the enforcement is sought. The parties hereby authorize any court of competent jurisdiction to modify any of the Restrictive Covenants to the extent necessary to make the same enforceable.

XVI. **Waiver**.

If either party waives a breach of this Agreement (which waiver must be in writing and signed by the party entitled hereunder to waive such breach) or fails to exercise any rights under this Agreement, such waiver or failure to exercise rights shall not be construed as a waiver of any subsequent breach or right under this Agreement, or affect the party's right thereafter to exercise any such rights.

XVII. **Choice of Law**.

This Agreement shall be construed according to the laws of the State of Hawaii.

XVIII.     **Construction**.


Paragraph headings are for reference convenience only. Pronouns of any gender shall include and mean all other genders, and singular shall include the plural, as the context may require.


XIX.   **Survival**.


The terms of Paragraphs III, IV.C., V, VI, VII, VIII, IX.C., IX.D., XI, XIII, XIV, XV, XVI, XVII, XVIII, and XIX shall survive any termination of this Agreement.


**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement on the date first written above.


EMPLOYER:

SHELL DEVELOPMENT
CORPORATION-LAWAI, a Hawaii
corporation and sole general
partner.


By:_____
   Name (Printed): _CRAIG GOLDSTEIN_
   Title: _Vice President - Finance_


Date:____ _6/23/95_

YOU:

_____
NORMAN HANSEN

Date:____ _6/27/95_ _____

## EXHIBIT A

### Description of Duties

### DIRECTOR OF SALES/KAUAI

#### General

In general, the Director of Sales/Kauai shall be in charge of all aspects of the sales of Intervals in the Phase II Project on the Island of Kauai and Employer's sales department on the Island of Kauai, subject to direction from the Chairman, Vice Chairman, Vice President-Finance, and Vice President-Project Manager of Employer and from outside consultants retained by Employer. The duties of the Director of Sales/Kauai shall include the following general type activities:

(1)    Establish a "Recruiting Program" which furnishes progressively higher quality candidates and provides a sufficient number of such candidates to meet growth needs of Employer on the Island of Kauai;

(2)    Establish entry level, ongoing and advanced level "Training Programs" for individuals in Employer's sales department on the Island of Kauai;

(3)    Maintain tight "inventory controls";

(4)    Coordinate effectively between the sales department on the Island of Kauai and the contract administration department;

(5)    Insure that all members of the Kauai sales department who are required to be so are, in fact, fully licensed and registered in compliance with all applicable laws and that all such licenses and registrations are current and in good standing; and

(6)    Maintain high morale, discipline and esprit within the Kauai sales department and Employer's entire organization, including, without limitation, enforcing the ARDA Code of Ethics within the Kauai sales department.

## Specific

In addition to the above general duties and tasks, Employer and You have agreed that Your duties include achieving and maintaining the following specific performance standards:

(1)    Achieve a "Net Close Ratio" for sales on the Island of Kauai that is equal to or exceeds the ratio utilized to prepare the Budget;

(2)    Keep the percentage of rescissions for sales on the Island of Kauai below the percentage utilized to prepare the Budget;

(3)    Achieve an average Interval price for sales on the Island of Kauai in excess of the

price utilized in the Budget.

# EXHIBIT B

## Initial Budget

VIA  FACSIMILE AND U.S. MAIL

**Shell Vacations LLC**

August 30, 2002

Mr. Francis G. Hutchinson
Tait Ltd.
3-3134 Kuhio Hwy.
Lihue, HI 96765

For Discussion Purposes Only

40 Skokie Boulevard
Suite 350
Northbrook, IL 60062

Telephone
847-564-4600

Facsimile
847-564-0703

RE: Reconciliation

Dear Rusty:

As we discussed, I am enclosing a computation of amounts due with respect to our lawsuit with you and Tait, as well as the Lawai Beach participation. This computation is also based upon the reconciliation previously forwarded to you and your attorney as of July 12, 2002.

The first portion of the computation relates to the 40% bonus based upon the participation fee for Lawai Beach less appropriate deductions for fees and amounts incurred in order to be able to achieve a mutually agreeable settlement with Metropolitan Mortgage. As you are aware, in order be able to collect a participation fee from Metropolitan, we were forced to prepare and file a lawsuit, which resulted in excess of $25,000 in legal fees paid to Piper Marbury. This does not include, nor have we reflected in the computation, the countless hours spent on this matter by Shelly, Craig, and me to bring it to conclusion.

Metropolitan also made it a condition of settlement that an unrelated transaction be resolved simultaneously with the Lawai Beach lawsuit. This matter involved a foreclosure on an Arizona home owned by Champion Partners, an entity in which Shelly and Perry had an interest, by an affiliate of Metropolitan. In order to settle Lawai Beach, we needed the cooperation and aid of the non-Shell Champion partner, which necessarily included our reimbursement to Champion of $50,000 for fees and costs expended. Metropolitan would not resolve Lawai Beach without an agreement by Champion to allow Metropolitan's affiliate to foreclose without interference or objection and we had no choice but to acquiesce.

Assuming Shelly and Perry had agreed to pay a 40% bonus on the net participation fee received from Metropolitan, this would equate to 40% of $1,674,463 or $669,785. Also assuming that Norm Hanson was entitled to 10% of the net participation fee, this would equate to 25% of $669,785 or $167,446, which is reflected on the computation. Any amount which might be claimed by Herb Lee to be due to him as a part of the $669,785 is not included in the computation. You had advised in writing on July 10, 2000 that you did not believe Herb Lee should be entitled to any percentage of the participation fee bonus, a copy of which letter is enclosed. Our settlement with you must include assurance that Herb Lee has no



EXHIBIT
F

Mr. Francis G. Hutchinson
August 30, 2002

claim, which car be achieved by way of a release from Herb and an indemnity from you.

The offsets shown in the computation that are due to Tait of $109,885 are noted in the July 12th reconciliation and the chargeback amounts of $531,539 are also indicated in such reconciliation. The payments to Goldstein and Ashley for legal fees related to the Tait litigation are included in the computation, but if this lawsuit is settled and dismissed, those Tait legal fees to Goldstein and Ashley would be removed as amounts due from Tait or you to us.

The Reigel lawsuit is a different problem as it was created due to the actions and representations of Tait and its agents and we have not been able to resolve this matter even through mediation. There is potential liability for Peacock Suites and Shell that may result from this action and we will need to take this into consideration by way of an escrow, credit, and/or indemnity as part of our settlement with you. This liability could exceed $70,000, not including legal fees do defend.

Based on the computation and reconciliation, the enclosed reflects a net amount due from you to Shell of $1,327. Again, if we can settle and dismiss the Tait litigation, as well as all matters between us, the $16,659 plus additional fees incurred for Goldstein and Ashley in the Tait litigation would be waived by us.

After you have reviewed the enclosures, please feel free to contact Craig or me regarding any questions. As Perry has explained, it would be our goal to amicably resolve all issues between us relating to Peacock Suites, Tait, and Lawai Beach. We appreciate your attention and cooperation.

Very truly yours,

SHELL VACATIONS LLC

Daniel B. Glickstein
General Counsel

DBG:jlp

Enclosure
cc: Sheldon Ginsburg
    Perry Snyderman
    Craig Goldstein
    Neal Goldstein

For Discussion Purposes Only                    August 30, 2002

Computation of Amounts due Rusty Hutchinson

|  | 40% Bonus |
|---|---|
| Phase I Agreed Upon Participation Fee | 1,750,000 |
| Participation Fee Advance Previously Paid | |
| Total Participation Fee | 1,750,000 |
| | |
| Deductions: | |
| Payment to Champion Partners | 50,000 |
| Payment to Piper Marbury | 25,537 |
| Total Deductions | 75,537 |
| Total Net Participation Fee Revenue Received | 1,674,463 |
| Rusty Share | 669,785 |
| Less: Norm Hanson Share @25% | (167,446) |
| Less: Offsets to amounts due Rusty | |
| Amounts Due Rusty Per Shell Reconciliation | 109,885 |
| Chargebacks due to Shell from Rusty | (531,539) |
| Payments to Goldstein and Ashley: | |
| Reigel Case | (16,852) |
| Tait | (16,659) |
| Advances from Phase I bonus paid to Rusty | |
| As part of Phase II. | (48,500) |
| Net Amounts Due Rusty/(Shell) | (1,327) |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE HOLDERMAN

In the Matter of **NORMAN N. HANSEN**

MAGISTRATE JUDGE BOBRICK

v.

**SHELL DEVELOPMENT CORPORATION-LAWAI**, a Hawaiian corporation, **SHELL DEVELOPMENT CORPORATION**, an Illinois corporation, **SHELL HOLDINGS, INC.**, a Delaware corporation, **SHELL VACATIONS, LLC**, and **SG, INC.**, an Illinois corporation,

Case Number: **03C 6050**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

### NORMAN N. HANSEN

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME   VINCENT A. LAVIERI | NAME   STEVEN L. WISER |
| FIRM   DEFREES & FISKE | FIRM   DEFREES & FISKE |
| STREET ADDRESS   200 S. Michigan Ave., #1100 | STREET ADDRESS   200 S. Michigan Ave., #1100 |
| CITY/STATE/ZIP   Chicago, IL 60604 | CITY/STATE/ZIP   Chicago, IL 60604 |
| TELEPHONE NUMBER 312/372-4000   FAX NUMBER 312/939-5617 | TELEPHONE NUMBER 312/372-4000   FAX NUMBER 312/939-5617 |
| E-MAIL ADDRESS   valavieri@defrees.com | E-MAIL ADDRESS   wiser@defrees.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)   03128067 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)   6244922 |
| MEMBER OF TRIAL BAR?   YES X   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO X |
| TRIAL ATTORNEY?   YES X   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO X |
|   | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO X |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME   DOUGLAS C. GIESE | NAME |
| FIRM   DEFREES & FISKE | FIRM |
| STREET ADDRESS   200 S. Michigan Ave., #1100 | STREET ADDRESS |
| CITY/STATE/ZIP   Chicago, IL 60604 | CITY/STATE/ZIP |
| TELEPHONE NUMBER   312/372-4000   FAX NUMBER 312/939-5617 | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS   dcgiese@defrees.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)   6242975 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO X | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO X | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO X | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Civil Cover Sheet **03C 6050** MAGISTRATE JUDGE BOBRICK

This automated JS44 conforms generally to the manual JS44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only the Northern District of Illinois.

Plaintiff(s): **NORMAN N. HANSEN**

Defendant(s):**SHELL DEVELOPMENT CORPORATION-LAWAI, a Hawaiian corporation, SHELL DEVELOPMENT CORPORATION, an Illinois corporation, SHELL HOLDINGS, INC., a Delaware corporation, SHELL VACATIONS, LLC, and SG, INC., an Illinois corporation,**

County of Residence: Douglas County, Nevada

County of Residence: Cook County

Plaintiff's Atty:   Vincent A. Lavieri
DEFREES & FISKE
200 S. Michigan Ave., #1100, Chicago, IL 60604
312/372-4000

Defendant's Atty:
PIPER RUDNICK
203 N. LaSalle St., #1800, Chicago, IL 60601
312/368-4000

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principal Parties
(Diversity Cases Only)

Plaintiff:-**2 Citizen of Another State**
Defendant:-**4 IL corp or Principal place of Bus. in IL**

IV. Origin :        **1. Original Proceeding**

V. Nature of Suit:        **190 Other Contract**

VI.Cause of Action:        **Breach of Employment Contracts by Defendants which are affiliated entities. Complete diversity with claim in excess of $75,000.00. Jurisdiction pursuant to 28 U.S.C. Section 1332 (a)(2)**

VII. Requested in Complaint
Class Action: **No**
Dollar Demand:
Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:   8/27/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**   Revised: 06/28/00